THE STATE v. JASPER GIBILTERRA, *alias* SAM BOMMERITO, Appellant.—
116 S. W. (2d) 88.

Division Two, May 3, 1938.

578

*Roy McKittrick,* Attorney General, *Olliver W. Nolen,* Assistant Attorney General, and *Lawrence L. Bradley* for respondent.

ELLISON, J.—The appellant was convicted of murder in the first degree and his punishment fixed by a jury at life imprisonment in the penitentiary, for killing William C. Hite with a knife in the city of St. Louis. He has filed no brief. His motion for new trial contained 27 assignments of error. Some of these are too general to comply with the new trial statute, Section 3735, Revised Statutes 1929 (Mo. Stat. Ann., p. 3275), and will not be discussed. We shall consider the others in groups, where possible.

A question is raised as to the sufficiency of the evidence. Aside from proof of *corpus delicti,* the State's case rests altogether on two confessions made by appellant to the St. Louis police. In the second of these he implicated another man named Scorfina. It is claimed they were incompetent because extorted by physical violence and promises of immunity, and that the trial court erred in admitting them in evidence. If this is true, the State is left without sufficient evidence to support the verdict.

The appellant is an ex-convict twenty-seven years old. The deceased was a weak, sickly man past middle age, afflicted with consumption or some bronchial ailment, who conducted a secondhand store at 1809 Franklin Avenue in St. Louis. He lived alone on the second floor above his store. The date and hour of his death are unknown, but it occurred sometime in the late afternoon or night of Saturday, November 9, 1935. The corpse was discovered on the floor of the store room the next morning by Fred Scott, who had gone there to pick up some articles he had purchased the day before. Small electric lights were burning in the windows but not in the

store and the front door was locked. However, the back door was ajar. In response to Scott's telephone call police officers Bland and Cox and Sergeant Dreckshage came to the scene of the homicide. Conditions indicated there had been a struggle: a chair was tipped over; a shoe was off one of the deceased's feet; a trouser leg was pulled up; and the body was lying in a twisted, unnatural position, nearly on the back, but partly on one side.

The corpse lay in a pool of blood with a bloody closed knife and a pick handle nearby. There were many cuts on the neck, face, head, and chest. The carotid artery was severed and the skull fractured. Dr. Wm. J. Doyle, autopsy physician for the coroner performed an autopsy on the body three days after the homicide and gave it as his professional opinion that the cause of death was, fracture of the skull, laceration of the brain, hemorrhage from the severed artery and the cuts and lacerations.

There was no expert or other testimony as to how long Hite had been dead when found. But a neighbor, Shobal Boatman, whose living quarters were close to and well within hearing distance of those of the deceased, said he and members of his family were playing cards until about 10 o'clock the night of the murder and did not hear him coughing, as they usually did at night. But on cross-examination it was developed that at the coroner's inquest Boatman had testified the last time he heard Hite coughing was between 8 and 9 o'clock that night, and he said he did not want to change that answer. His wife, Mae Boatman, was a witness for the appellant. She said she heard the deceased coughing as late as 10:30 or 11 o'clock that Saturday night. This also was her testimony at the coroner's inquest. Charles Mantia, another defense witness, declared Hite came to his store about 8 or 8:15 that night to buy some baking soda. No one else was in the store at the time. But he admitted on cross-examination that he had not given this information to the police when they were investigating the homicide just after it occurred; and that the first time he had ever told that story publicly was at the trial. He asserted, however, the police questioned him accusingly; that he only told them what they asked him about; and that they didn't inquire when he had last seen the deceased. All this evidence as to the time of the killing was important because of its bearing on the appellant's defense, which was an alibi. Singularly enough nobody heard the struggle when Hite was killed.

The appellant was not arrested until nearly a month later on December 7, 1935, after an informer disclosed to the police that he might have had some connection with the crime. Sergeant Forthman apprehended him about 10:30 o'clock that night on the street in front of 1915 Franklin Avenue, near Hite's store. The appellant lived and worked desultorily in that vicinity and had remained there after the homicide. In fact he was present when the body of the

deceased was taken away. Sergeant Forthman had known the appellant for twelve years and said he readily agreed to tell all about the killing if they would take him upstairs at police headquarters. He was questioned by Assistant Circuit Attorney McLaughlin. Miss Amanda Bartling, stenographer in the office of Chief McCarthy was called, and took in shorthand and transcribed the questions and appellant's answers, about 1:30 in the morning. Sergeant Forthman said it was about 3 A. M.

The facts about the appellant's two confessions were developed in an unusual manner. Sergeant Forthman, who made the arrest, was permitted without objection to testify before the jury concerning them. He said after he had talked to appellant for about an hour at police headquarters the latter requested that Chief of Detectives Carroll or Lieutenant Murphy be called; which was done. Miss Bartling, the stenographer, was summoned. Appellant said he would make a statement but would not sign it without seeing his lawyer. That was what he did. The second statement was made the following (Sunday) afternoon. Appellant said he had thought it over during the night and wanted to tell the whole truth. Forthman signed as a witness to both confessions. Both were marked as exhibits and identified by the officer. He declared the appellant was not mistreated in any way, shape or form before either was made. He was vigorously cross-examined on that point before the jury and reiterated his previous statements, stating that both confessions were freely and voluntarily made by the prisoner of his own volition.

Next, Miss Bartling testified about writing the first confession. Following that the confession was offered in evidence. Then, for the first time, appellant's counsel objected on the ground that it was involuntary and was obtained by violence, abuse and promises; and indicated they desired the court to make an inquiry thereinto. But counsel refused to produce any testimony to substantiate their objection, saying they would do so in open court before the jury. The court inquired: "How is the Court going to pass on your objection without hearing testimony as to your objection?" Appellant's counsel replied: "The Court has heard what testimony it has in here." In other words counsel wanted the court to exclude the confession on the evidence thus far heard. The objection was overruled "for the present;" and counsel saved an exception. The court inquired, "Does that settle it?" and counsel answered in the affirmative. Then the first confession was read to the jury, which had been present during the foregoing colloquy. After it was read appellant's counsel moved that it be stricken from the record and the jury instructed to disregard it, for the reasons already stated; and also asked that a mistrial be declared and the jury discharged. These requests were overruled and exceptions saved.

Next Lieutenant Murphy was called to the stand. He was present when both confessions were made, and explained that about 11 A. M. the morning after the first, unsigned confession had been written, the appellant asked to be taken to the office of Chief of Detectives Carroll, where he announced he desired to change some untrue statements therein. The second confession was taken and transcribed by a stenographer about 1 P. M., and was signed by appellant on each page. The witness declared appellant was not abused in any way before making it. The confession was offered in evidence, and appellant's counsel renewed the objection made to the first confession. They further stated in answer to a question from the court that they wanted to follow the course they had adopted on the admission of the first confession—that is, by reserving for the jury their proof of the involuntary nature of the confession. The objection was overruled, exceptions saved, and the confession was read to the jury. Following that appellant's counsel led the witness through a long, searching cross-examination, in which he again denied that appellant was subjected to any violence, abuse, threats, or sweating, and also denied that any promises of immunity were made to him.

Considering all the evidence the State made a substantial showing that the confessions were voluntary. The appellant made a substantial showing to the contrary. His girl friend, Lucille Hutchcraft, said that when she saw him he "looked terrible;" that his clothes were mussed and he appeared to be suffering from loss of sleep. She noticed no bruises or marks on his face. The appellant's wife testified to the same disheveled condition; that his physical appearance and swollen neck and face indicated he had been beaten; that he had to sit on the edge of a chair and couldn't straighten his back; that he told her he had been severely beaten and couldn't straighten out; that the police would not let her kiss him. The appellant said the police slapped his face, punched him in the kidneys, pulled his hair, and hit him once with a rubber hose. He declared he made the first confession to escape this beating, and the second confession because the police said his wife was locked up and that they only wanted him to be a State's witness against Scorfina, who, they said, had confessed. They promised to turn him loose after the case against Scorfina was over with.

In the first confession the appellant assumed sole responsibility for the homicide. He said he went to Hite's store about 4:45 o'clock on Saturday afternoon to buy a secondhand doctor's kit. Hite asked $3 for it; the appellant offered $2. Finally Hite refused to sell it to him at all, and cursed him. Appellant became angry, struck Hite with his fist and knocked him to the floor where they struggled. Hite reached toward the dresser where there was a knife. Then appellant cut him with his own knife until Hite ceased to struggle

and died. Then he took $4.50 from the pants pocket of the deceased, turned out the lights in the store room and fled, thereafter burning his bloody clothing. In the second confession he said he. and Sam Scorfina learned Hite kept a large amount of money in his store. They went to the store about 5 o'clock Saturday afternoon to rob Hite. Appellant held him while Scorfina beat him over the head with a revolver, and then with a pick handle. After he fell Scorfina cut him with a knife. Scorfina took Hite's pocket book and also some silver money from a drawer. Each got $4.20. Appellant burned his bloody clothes.

Appellant denied at the trial that he had anything to do with the homicide or knew anything about it. He testified he went to the home of his girl friend, Lucille Hutchcraft, not later than 2 o'clock that Saturday afternoon and remained there until 5 o'clock or a little later. She then lived at 2221 Cass Avenue, St. Louis. Then he went home, arriving about 5:30. He remained there until 6:30 or 6:45 P. M.; later he said until about 6 P. M.; then he said 7:30 P. M. and still again, close to 7 P. M. Whenever it was, he left with his boss, Chapman, riding on the latter's truck as far as Twentieth Street and Cass Avenue, whence he walked two blocks to his girl's home, arriving there about 8 o'clock. He was there only a little while. She and he went to Charles Mantia's store and the Liberty Cafe on Eighteenth Street and Franklin Avenue where they remained until about 9 P. M. They were joined at the cafe by Sam Scorfina and another girl, and all went to the walkathon. They did not return home until after 3 A. M.

Appellant was corroborated, and also contradicted, by several defense witnesses. His girl friend, Lucille Hutchcraft testified he came to her home in the afternoon at 4 or 4:30 o'clock (instead of 2 P. M.). The girl's father said he first came about 2 o'clock; and the mother, 2 or 3 o'clock. All agreed he left about 5 P. M. and came back about 8 o'clock or earlier. Appellant's wife testified that he worked at the store of his boss under the rooms where they lived, all day Saturday. He left about 12:30 or 1 P. M. for ten or fifteen minutes during which she stayed in the store, and again at 5 o'clock for a short time. Except for these two times he was at the store and at home all afternoon and evening, until 7 P. M., when he and Chapman left in the latter's truck. Chapman testified he got to appellant's house about 5:40 P. M., stayed there "not very long," and left with his truck arriving at his own home "around after six o'clock." Appellant rode with him, driving the truck north on Eighteenth or Nineteenth Street until he got off and picked up a girl on the street. Appellant denied this latter incident. It will be seen all this evidence conflicts on the important matter of time and the appellant's whereabouts. His own story is not convincing that it took him until about 8 o'clock to walk two blocks to his girl's home

from where he left Chapman's truck—if he did not meet the girl on the street. The matter is further complicated by the fact that Charles Mantia testified appellant was in his store with Mrs. Hutchcraft between 6 and 7 o'clock the same evening.

A number of witnesses agree that appellant was at the walkathon with the parties he named until the small hours of that Saturday night or Sunday morning. Lucille Hutchcraft, Charles Mantia, Mr. and Mrs. Peter Bruno and Mr. and Mrs. Vincent Dragoo all testified to that. And his wife said he did not get home until early morning. But a significant fact is that appellant's wife testified he was wearing a light blue sweater that afternoon and evening. (She said he still had it.) Mrs. Hutchcraft testified appellant wore a lumber jacket to the walkathon, which is the kind of a garment appellant said in his second confession Scorfina loaned him after he burned his own sweater following the murder. It was shown that Scorfina was questioned by the police and steadfastly denied any connection with the crime; and that a grand jury refused to indict him. If any finger prints were found on any objects in the store, the fact was not proven.

If no error was committed in submitting the two confessions to the jury, it seems clear to us that the State made out a case of second degree murder under the first confession and of first degree murder with an accomplice in the perpetration of a robbery, under the second confession, although the time of the homicide is not fixed beyond dispute, in view of the testimony that Hite was alive and heard to cough between 8 and 11 P. M. that night. These, however, were questions for the jury.

On the important question whether the two confessions were improperly admitted in evidence, the learned Assistant Attorneys General contend that appellant waived his objection to them: (1) by permitting the State's evidence showing they were voluntary to be heard by the jury without objection; (2) and by refusing to introduce any evidence before the court out of the presence of the jury in support of his objection that they were involuntary. This question was approached but not decided, on somewhat different facts, in State v. Williamson, 339 Mo. 1038, 1047, 99 S. W. (2d) 76, 79. In the instant case we cannot see how the trial court's ruling could have been other than it was. Without challenge appellant allowed the State to lay the foundation for the introduction of the confessions by presenting to the jury substantial evidence that they were voluntary. The objection that they were involuntary came afterward when the confessions, themselves, were offered in evidence. But having made that objection appellant declined to introduce any testimony in support thereof—meeting the State's evidence already in—and announced he would reserve it for a showing before the jury. This was nothing less than an invitation to

584

let the confessions go before the jury and was binding on appellant—unless it can be said the showing already made by the State fell short of the requirements of the law.

Ordinarily such inquiries are conducted by the court in the absence of the jury. Some decisions hold the court has the right thereat to *determine* (necessarily by weighing the evidence) whether a confession should be submitted to the jury.[1] Others appear to hold that where the evidence is substantial and conflicting, the question should be referred to the jury.[2] A few of these cases say this is true where the State has made a *prima facie* showing. One of them, State v. Hayes (Mo. Div. 2), 247 S. W. 165, 168(7) ruled the burden rests on the accused to overcome by evidence the *presumption* that his confession was voluntary, but that case has since been distinguished, if not overruled, State v. Williamson, supra, 330 Mo. l. c. 1048, 99 S. W. (2d) l. c. 81. An extensive annotation on the question will be found in 85 A. L. R. 870, 901, where Missouri is classed as a "doubtful jurisdiction."

The rule in this State to be gathered from the cases cited in the margin and others is that if the defendant object to the admission of the confession on the ground that it was involuntary, and request a preliminary inquiry out of the presence of the jury, the same should be granted. At that hearing if the evidence is conflicting and substantial the court may determine the mixed question of law and fact by weighing the evidence; and if convinced one way or the other should rule accordingly. The State carries the burden of proof at such preliminary hearings.

It is not the law that if there be any substantial evidence indicating the confession was voluntary the court *must* refer the question to the jury, however much it may be outweighed by evidence to the contrary. If that were true the court would be doing no more

(1) State v. Patterson, 73 Mo. 695, 706; State v. Hopkirk, 84 Mo. 278, 284; State v. McKenzie, 144 Mo. 40, 48, 45 S. W. 1117, 1119; State v. Brennan, 164 Mo. 487, 510, 65 S. W. 325, 330(6); State v. Stebbins, 188 Mo. 387, 397, 87 S. W. 460, 463; State v. Barrington, 198 Mo. 23, 109, 95 S. W. 235, 263 (15); State v. Armstrong, 203 Mo. 554, 559, 102 S. W. 503, 504; State v. Brooks, 220 Mo. 74, 83-4, 119 S. W. 353, 356; State v. Nagle, 326 Mo. 661, 671, 32 S. W. (2d) 596, 600(2).

(2) State v. Brooks, 92 Mo. 542, 577; State v. Moore, 160 Mo. 443, 460-1, 61 S. W. 199, 205; State v. Brennan, 164 Mo. 487, 510-11, 65 S. W. 325, 330; State v. Stebbins, 188 Mo. 387, 396-8, 87 S. W. 460, 463; State v. Jones, 171 Mo. 401, 407, 71 S. W. 680, 682; State v. Church, 199 Mo. 605, 632, 98 S. W. 16, 22; State v. Spaugh, 200 Mo. 571, 597, 98 S. W. 55, 62(3); State v. Thomas, 250 Mo. 189, 214, 157 S. W. 330, 338 (16); State v. Meyer, 293 Mo. 108, 114, 238 S. W. 457, 459(8); State v. Reich (Mo. Div. 2), 239 S. W. 835, 837 (7); State v. Ellis, 294 Mo. 269, 281, 242 S. W. 952, 955 (2); State v. Seward (Mo. Div. 2), 247 S. W. 150, 153(6); State v. Hayes (Mo. Div. 2), 247 S. W. 165, 168(7); State v. Adams, 316 Mo. 157, 166-7, 289 S. W. 948, 952 (7); State v. Custer, 336 Mo. 514, 521, 80 S. W. (2d) 176, 180; State v. McPhearson (Mo. Div. 2), 92 S. W. (2d) 129, 132 (7).

than it always does throughout a trial in ruling on the admissibility of evidence; and there would be no need of such preliminary hearings except in the rare instances when such evidence is wholly lacking. On the other hand, when there is substantial conflicting evidence and the question is close it is better to refer the underlying issue of voluntariness to the jury than to exclude the confession, since there is less chance of a miscarriage of justice by leaving the question open to a second determination, before the jury on a rehearing of the evidence under proper instructions, than by foreclosing the inquiry. The court then can still exclude the confession if it finds from all the evidence, including that introduced at the preliminary hearing, that the same was involuntary. [Briscoe v. State, 67 Md. 6, 8 Atl. 571.] But in either event unless manifest error has been committed appellate courts will defer to the trial court's ruling in view of its better opportunity to arrive at the truth. [State v. Hopkirk, 84 Mo. 278, 284.] In this case, on the record presented we are not warranted in overturning the finding of the trial court and jury.

 This brings us to the instructions. Although the appellant's confessions were the crucial evidence in the case, no instruction was given by the court for the guidance of the jury in its consideration of them. The appellant requested five instructions, C, D, F, G and K on this point, all of which were refused. He assigned error on that ground in his motion for new trial, and also incorporated a separate assignment in the motion charging error in the failure to give an instruction stating that the confessions "should not be received in evidence against this defendant for any purpose whatsoever, unless there (they) were entirely voluntary statements of the defendant."

If the issue is submitted to the jury and all the evidence shows the confession was voluntary, the court need not instruct thereon, even though requested to do so. [State v. McNeal (Mo. Div. 2), 237 S. W. 738, 741(1).] If the issue goes to the jury on conflicting evidence many cases say it should be submitted under appropriate instructions.[3] But it is further held an instruction on the voluntariness of a confession need not be given as a part of the law of the case under Section 3681, Revised Statutes 1929 (Mo. Stat. Ann. p. 3227),

---

(3) State v. McKenzie, 144 Mo. 40, 48, 45 S. W. 1117, 1119; State v. Moore, 160 Mo. 443, 460, 61 S. W. 199, 205; State v. Brennan, 164 Mo. 487, 512, 65 S. W. 325, 331; State v. Thomas, 250 Mo. 189, 214-5; 157 S. W. 330, 338; State v. Simeonson, 263 Mo. 264, 268, 172 S. W. 601, 602(6); State v. Meyer, 293 Mo. 108, 114, 238 S. W. 457, 459(8): State v. Seward (Mo. Div. 2), 247 S. W. 150, 153(6); State v. Hayes (Mo. Div. 2), 247 S. W. 165, 168(7); State v. Lowry (Mo. Div. 2), 12 S. W. (2d) 469, 473(3).

without a request therefor.[4] However, where an instruction on a matter of this kind is formulated and requested by him, if it is not in proper form the trial court should prepare and submit a proper instruction, unless the question is sufficiently covered by other instructions.[5]

As stated, the appellant did present five instructions on this issue, C, D, F, G, and K, all of which were refused. We would not be justified in using the space necessary to set them all out here. Instructions C and G were verbose and full of intensifying adjectives which make them objectionable. Instruction D was predicated on the theory that the appellant was coerced into making the confessions by statements and acts of the police which led him to believe his wife would be incarcerated indefinitely unless he confessed. This kind of a promise for the benefit of a third person is not, it seems, sufficient to invalidate a confession, though that doctrine has been questioned. [State v. Williamson, supra, 339 Mo. l. c. 1045, 99 S. W. (2d) l. c. 79(6).] Instructions F and K appear to be unobjectionable unless it be for the words we have italicized in the latter, though we are not passing on them here. They were as follows:

"F"

"The Court instructs the jury that if you find and believe that the defendant made the oral and written statements offered in evidence, but that he was induced to make them in the hope, from what had been said to him by those who had him in charge, that he might be more leniently dealt with if he confessed; you will find such statements to be involuntary and of no weight or value as evidence against the defendant, and should be rejected altogether."

"K"

"The Court instructs the jury that no statement, written or oral, whether true or false, made by the defendant, in relation to the offense charged, to officers of the law while in their custody after his arrest, and offered in evidence by the State in this case, shall be considered as evidence against him, unless *wholly and entirely* voluntary."

If the instructions submitted were deemed improper the court should have given a proper instruction. As the case must be retried, we add a word about the directions which should be given in an instruction on the issue. In State v. Brennan, supra, 164 Mo. l. c. 512,

---

(4) State v. Brooks, 92 Mo. 542, 587; State v. Clark, 147 Mo. 20, 37, 47 S. W. 886, 890 (6); State v. Thomas, 250 Mo. 189, 215, 157 S. W. 330, 338(18); State v. Baker (Mo. Div. 2), 278 S. W. 987, 989(2); State v. Hancock, 340 Mo. 918, 925, 104 S. W. (2d) 241, 245.

(5) State v. Brooks, 92 Mo. 542, 587; State v. Reed, 154 Mo. 122, 129, 55 S. W. 278, 280(3); State v. Moore, 160 Mo. 443, 460-1, 61 S. W. 199, 205; State v. Hendricks, 172 Mo. 654, 670, 73 S. W. 194, 199; State v. Thomas, 250 Mo. 189, 214-5, 157 S. W. 330, 338 (19); State v. Lawrence (Mo. Div. 2), 71 S. W. (2d) 740, 744(4).

65 S. W. l. c. 331, an instruction was criticized because it told the jury they should not *consider* a confession as evidence unless they believed and were satisfied from all the evidence that it was voluntarily made. The case held that since the admissibility of the confession was a judicial question already determined by the court the jury were not authorized to exclude it, and should be instructed to consider the circumstances in which it was obtained in determining the credibility of the evidence. This is not the law. The question of the voluntariness, upon which depends the competency, of the confession *is* referred to and determined by the jury; and if they find it was involuntary they should disregard it, even though they may believe the confession to be true. The defendant's constitutional right to immunity from self-incrimination is involved. Several subsequent decisions have correctly held that if the jury find the confession was involuntary they should *disregard* or *reject* it.[6] Instructions are set out or summarized in all these cases, cited in the margin, except the Meyer case.

Some of the decisions deal with instructions in the familiar form concerning statements of the defendant for and against interest, declaring that what the defendant said against himself the law presumes to be true. In these the adjective "voluntary" or the adverb "voluntarily" was inserted or omitted.[7] All such instructions are now held to be erroneous. [State v. Johnson, 333 Mo. 1008, 1013, 63 S. W. (2d) 1000, 1003; State v. Duncan, 336 Mo. 600, 612(6), 80 S. W. (2d) 147, 153(15); State v. Hancock, 340 Mo. 918, 925 (5), 104 S. W. (2d) 241, 246(6).]

Also, in a few cases the word "voluntary" is defined as meaning "spontaneously, of one's own will without being moved, influenced or impelled by others."[8] In our opinion this goes too far. As was said in State v. Thomas, 250 Mo. 189, 214-5, 157 S. W. 330, 338 (17), the word voluntary is so simple and in such general use that it need not be defined. Further, it was held in State v. Hopkirk, 84 Mo. 278, 284. "It is by no means necessary that the confession be spontaneous, otherwise no confession ever would be receivable. It is only where the confession may be said to be extorted, dragged reluctantly from the breast of the prisoner, through exciting his hopes

---

(6) State v. Stebbins, 188 Mo. 387, 396-8, 87 S. W. 460, 463; State v. Brooks, 220 Mo. 74, 84, 119 S. W. 353, 356; State v. Thomas, 250 Mo. 189, 214, 216, 157 S. W. 330, 338(19); State v. Wansong, 271 Mo. 50, 59-60, 195 S. W. 999, 1002(3); State v. Meyer, 293 Mo. 108, 115, 238 S. W. 457, 459(9); State v. White, 330 Mo. 737, 745, 51 S. W. (2d) 109, 113(6).

(7) State v. Thomas, 250 Mo. 189, 215-16, 157 S. W. 330, 339; State v. Wansong, 271 Mo. 50, 60, 195 S. W. 999, 1002(3); State v. Hayes (Mo. Div. 2), 262 S. W. 1034, 1036(5); State v. Schnurr, 285 Mo. 74, 76, 225 S. W. 678; State v. Hershon, 329 Mo. 469, 482, 45 S. W. (2d) 60, 65; State v. Hancock, 340 Mo. 918, 925(5), 104 S. W. (2d) 241, 245(6).

(8) State v. Lowry (Mo. Div. 2), 12 S. W. (2d) 469, 473(3); State v. Hershon, 329 Mo. 469, 483, 45 S. W. (2d) 60, 65; State v. White, 330 Mo. 737, 745, 51 S. W. (2d) 109, 113(6).

or practicing on his fears, by some promise or some threat, that the confession subsequently made is inadmissible.'' Indeed many cases hold that the use of artifice, deceit or falsehood in obtaining a confession will not render it inadmissible if it is not induced by physical violence, threats of harm, or promises of worldly advantage. [See the decisions cited in 9 West's Mo. Dig., sec. 530, p. 259.] The ultimate question is whether the accused acts on his own judgment and volition uninfluenced by methods and devices employed by the officers which the law denounced. [State v. Williamson, 339 Mo. 1038, 1044, 99 S. W. (2d) 76, 79(1).]

One assignment complains of the refusal of appellant's requested Instruction E on alibi. We think Instruction No. 7 submitted by the State fully covered this defense.

For the error in failing to instruct on the voluntariness of the appellant's confessions, the judgment is reversed and the cause remanded.

All concur.