THE STATE OF MISSOURI, Respondent, *v.* JOHN SIMON, Appellant.

1. *Criminal law — Indictment — Venue.* —The statement of venue in the margin of an indictment is a sufficient allegation of venue for all the facts stated in the body of the indictment.
2. *Criminal law — Confessions, when competent—Duress.*—The mere fact that a criminal was in charge of an officer at the time is not sufficient to render his confession inadmissible in evidence. But it must further appear that it was induced by the flattery of hope or the torture of fear, or intimidation.
3. *Criminal law — Dying declarations, when admissible — Fear of death.*— In order to render a dying declaration admissible, it should clearly appear that the statements offered in evidence were made under well-founded apprehension of immediate or impending dissolution.
4. *Criminal law — Evidence — Dying declaration — Truth of, to be determined by the court.*— The truth of the evidence introduced to show that the declarations were made in view of speedy death, is a matter exclusively for the court to determine.

### *Appeal from Lawrence Circuit Court.*

From the statement furnished on behalf of appellant, it appears that Goetz said to witness Tobien, "Dear friend, I have to die, I received two mortal wounds, and they pain me a great deal,"

and other words of similar import. The witness further testified that Goetz said to him, "In case I should die, I have a sister in Germany who has three children; I have three hundred dollars, and I want her to have it." The court then asked him what he said, and he replied, "When I die," etc.

*N. Bray* and *N. H. Dale*, for appellant.

I. The statement that the wounds were mortal is a matter of opinion, which cannot be given in evidence as dying declarations under any circumstances. (See 1 Phil. Ev., 4th Am. ed., 297; 1 Greenl. Ev., § 159.)

II. The court erred in admitting the testimony of DeGroff as to the conversation had with defendant. (1 Phil. Ev. 544, and cases cited; Roscoe's Crim. Ev., 6th Am. ed., 39.)

III. In order that the statements of the deceased may be admitted as dying declarations, it is necessary to be shown that they were made under the personal apprehension of impending death. (1 Phil. Ev., 4th Am. ed., 289, note; 1 Greenl. Ev., 11th ed., § 158; Roscoe's Crim. Ev. 31; Starkey v. The People, 17 Ill. 17.) And it is further necessary to be shown that the declarant had a deep impression of his accountability to his Maker, and that he was soon to appear before his Maker to give an account to him as his judge. And we think this is not to be presumed, but must appear affirmatively. (See 1 Phil. Ev. 288; 1 Greenl. Ev., § 157.

*A. J. Baker*, for respondent.

WAGNER, Judge, delivered the opinion of the court.

The defendant was convicted in the court below of murder in the first degree, for killing one Anton Goetz. Many objections have been urged against the verdict and the ruling of the court on the trial, but the only question which the record makes it necessary or material to notice is the action of the Circuit Court relating to the admission and exclusion of testimony. There is no force in the objection that error was committed in admitting testimony as to the place of Goetz's death because no venue was laid in the indictment. The county was stated in the margin of

the indictment, and that was a sufficient allegation of venue for all the facts stated in the body of the indictment. But had there been a defect in stating the venue, the indictment would not have been invalidated. (Wagn. Stat. 1090, §§ 26, 27.)

Again, it is complained of as error that the sheriff was permitted to testify concerning a confession which the prisoner made to him while in his custody. This testimony was afterwards stricken out on motion of defendant's counsel, but it is said that the jury was absent when the court ruled out the evidence as illegal, and that the exclusion was never brought to their notice. The record, however, does not show this fact, and the presumption is that the jury were present in court and were cognizant of the proceeding. But I am not of the opinion that the evidence was inadmissible. The admissibility of a confession depends upon its being free from the suspicion that it was obtained by threats of severity or promises of favor, and every influence whatever. A learned writer on the law of evidence, in stating the doctrine, says: "A promise of benefit or favor, or threat of intimidation or disfavor, connected with the subject of the charge, held out by a person having authority in the matter, will be sufficient to exclude a confession made in consequence of such inducement, either of hope or fear." (1 Phil. Ev. 544.) But all the authorities agree that to warrant the exclusion of the confession, it must have been induced by the flattery of hope or the torture of fear, or intimidation. (Hawkins v. The State, 7 Mo. 190; The State v. Brockman, 46 Mo. 566.)

The sheriff testified that while the prisoner was in his possession he remarked to him that he ought to have had more control over his passions, and perhaps he would not have been in the place where he was; and the defendant said that they had been trying to run over him for a month, and he had come to the conclusion not to stand it any longer. This remark was purely voluntary. No inducement was held out, of advantage or favor, nor was there any threat or intimidation to lead to fear of punishment.

The next and most important question in the whole case is as to whether the court erred in admitting certain dying declarations of Goetz. The declarations were made on the night before death

took place, and were made to the witness Tobien, who says that when he called on him he found him suffering from his wounds, and he remarked, "I have to die. I received two mortal wounds, and they pain me a great deal. In case I should die, I have a sister in Germany who has three children; I have three hundred dollars, and I want her to have it." In answer to an interrogatory from the court, the witness varied the language and said that the deceased remarked, "When I die, I have a sister in Germany," etc.

The rule in reference to receiving dying declarations in evidence is well defined, founded upon a clear reason and supported by uniform authority. From necessity these statements, made by one speaking not under the obligations of an oath, but in the very presence of death, are received in evidence. The principle, as stated by Lord Chief Baron Eyre, on which this species of evidence is admitted, is that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice. (Woodcock's case, 2 Leach, 3d ed., 563.)

In the last edition of Greenleaf on Evidence, Judge Redfield appends this note to the text: This evidence "is not received upon any other ground than that of necessity, in order to prevent murder going unpunished. What is said in the books about the situation of the declarant, he being virtually under the most solemn sanction to speak the truth, is far from presenting the true ground of the admission; for if that were all that is requisite to render the declarations evidence, the apprehension of death should have the same effect, since it would place the declarant under the same restraint as if the apprehension were founded in fact. But both must concur, both the fact and the apprehension of being *in extremis.* This presumption, and the consequent probability of the crime going unpunished, is unquestionably the chief ground of this exception in the law of evidence," and accordingly they

are received "only where the death of the deceased is the subject of the charge, and the circumstances of the death the subject of the declarations." (The King v. Mead, 2 B. & C. 605; 1 Phil. Ev., 4th Am. ed., 287; 1 Greenl. Ev. 181.)

In the last reported case on this subject in England, Byles, J., says: "Dying declarations ought to be admitted with scrupulous, and I had almost said with superstitious, care. They have not necessarily the sanction of an oath; they are made in the absence of the prisoner; the person making them is not subject to cross-examination, and is in no peril of prosecution for perjury. There is also great danger of omissions and of unintentional misrepresentations, both by the declarant and the witness, as this case shows. In order to make a dying declaration admissible, there must be an expectation of impending and almost immediate death, from the causes then operating. The authorities show that there must be *no hope whatever*. In this case the deceased said originally she had no hope at present. The clerk put down that she had no hope. She said, in effect, when the statement was read over to her, 'No! that is not what I said nor what I mean; I mean that at present I have no hope;' which is, or may be, as if she had said, 'If I do not get better I shall die.'" (Regina v. Jenkins, Law Rep., 1 C. C. R. 191.)

As there can be no cross-examination of the declarant, as the accused can rarely meet his accuser face to face, and as there must of necessity exist great danger of abuse, it should clearly appear that the statements offered in evidence have been made under a full realization that the solemn hour of death has come, and the court should be satisfied that the declaration was made under an impression of almost immediate dissolution. The court must decide upon the admissibility of the declarations; and the truth of the facts put in evidence, to show that declarations were made in view of speedy death, is a matter exclusively for the court to determine.

Now, does the evidence show a state of facts which would authorize the admission of the dying declarations? That the wounds were mortal was the mere opinion of the deceased, and there was no evidence to show that they were necessarily so. The

physicians were in attendance, but they had not communicated any such information to him.    The expression "if I die" showed that hope still lingered in his bosom.    The witness afterwards used the language "when I die" as the words of the deceased, but which of the two expressions were used is left in uncertainty.    No further inquiries were made, and there seems to have been no effort to settle precisely what the deceased did say.    Any person who has been accustomed to attend on those who are injured, or are very ill, knows how common it is for them to say that they will never recover, or that they will die, when there is no good or sufficient reason for the apprehension, and they are not conscious themselves that they are in any real danger.    Such expressions are often the result of impatience, restlessness, or great suffering. But at the same time let the attending physician inform them that there is no hope, and that they must die, and they will be perfectly startled.    I do not think that under all the circumstances Tobien's testimony made out a case authorizing the statements of the deceased to go to the jury as dying declarations.    It does not sufficiently appear that he had given up all hope and was under a well-founded apprehension of impending or immediate dissolution.

The record discloses no other error necessary to be considered. It is useless to examine the instructions, as the case is not reversed on them, and the same state of facts may not be presented on a retrial.

Let the judgment be reversed and the cause remanded.    The other judges concur.